UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN THOMAS, JR. #571060,

    Plaintiff,

v.

ALEXANDER RAY FOX, et al.,

    Defendants.

_____/

Hon. Robert J. Jonker

Case No. 1:22-cv-1038

**REPORT AND RECOMMENDATION**

Plaintiff Kevin Thomas, Jr., a prisoner currently incarcerated with the Michigan Department of Corrections, filed his complaint in this action on November 7, 2022, against Kent County Sheriff's Department Detective Alexander Ray Fox and Kent County Assistant Prosecutor Angela Moblo Curtis. Thomas asserted a Fourth Amendment malicious prosecution claim pursuant to 42 U.S.C. § 1983 arising out of his prosecution and acquittal by a jury following trial on the charge of delivery of a controlled substance causing death (DCSCD), in violation of Mich. Comp. Laws § 750.317A. Following initial review pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court permitted the action to proceed against Defendant Fox. (ECF Nos. 7 and 8.)

Presently before me is Thomas's Motion for Summary Judgment (ECF No. 39) and Defendant Fox's Motion for Summary Judgment (ECF No. 41), both of which are fully briefed and ready for decision.[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that Fox's motion be **GRANTED** and Thomas's motion be **DENIED** because: (1) Thomas is collaterally estopped from

---

[1] I deny Fox's request for oral argument because the briefs adequately develop the issues, and oral argument would not aid the decisional process.

relitigating probable cause; and (2) Thomas cannot demonstrate a deprivation of liberty under the Fourth Amendment.

## I. Background

In the afternoon of June 20, 2019, Karla Scott found her 28-year-old daughter, Alison Gidley, unresponsive in the bathroom of Scott's mobile home in Gaines Township, Michigan. (ECF No. 42-2 at PageID.248–50.) Soon thereafter, medical personnel arrived and determined that Gidley had overdosed on heroin and was not breathing. Despite life-saving attempts, Gidley died at the scene. (*Id.* at PageID.248.) In the bathroom, police officers found a syringe on the floor, a spoon that was suspected of being used to cook up a dose of heroin, and a pink bag containing syringes. (*Id.* at PageID.250–51.) The officers also located Alison's cell phone. (*Id.* at PageID.251.)

Defendant Fox and his supervisor, Sgt. Cammenga, responded to the scene at 5:20 p.m. to assist with the investigation. (*Id.* at PageID.251.) Fox interviewed Karla about the events of that day. Karla told Fox that Alison was addicted to heroin and "a frequent user of heroin." She said that every Wednesday for the past couple of years, Alison's "ex" had given her a couple hundred dollars to spend on a hotel room for her and her eight-year-old daughter, Alana. Karla said that Alison always used the money to buy heroin. Karla told Fox that she had reserved a room at the Grand Rapids Inn for Alison the previous day, June 19, so that she and her friend could have a pizza party for their kids. Karla believed that "it was room 230." (*Id.*)

Karla said that Alison appeared to be high when she arrived to pick up Alison and Alana from the hotel the morning of June 20. After they left the hotel, Karla drove Alison straight to Metro Hospital to have Alison's arm checked out because some packing in a wound from a recent surgery had come out. The three of them remained at the hospital until about 2:00 p.m. and then went to Karla's home to hang out for the afternoon. No one else visited the residence that afternoon

2

until Karla's boyfriend, Marty Brenner, arrived after work. (*Id.* at PageId.249, 51.) Shortly thereafter, Karla and Marty discovered Alison unresponsive in the bathroom and called for medical help. (*Id.* at PageID.252.)

Defendant Fox took custody of a cellphone that Karla identified as Alison's and used Alison's fingerprint to access it to try to determine the source of the heroin. (*Id.* at PageID.251; ECF No. 42-3 at PageID.287.) He reviewed Alison's recent text messages to determine whether any of them indicated a recent attempt to purchase drugs. (ECF No. 42-2 at PageID.252; ECF No. 42-3 at PageID.288.) Of particular interest was a recent conversation with someone identified as "BUKfrmGR" with an associated phone number of (616) 375-4313 that later was determined to belong to Thomas. Defendant Fox believed that the back-and-forth exchange indicated that Alison was seeking to buy drugs from the individual known as BUKfrmGR.[2] (*Id.* at PageID.252; ECF No. 42-3 at PageID.288.) Fox did not focus on other text messages on Alison's phone because they either were not very recent or contained no indication of drug dealing. (ECF No. 42-6 at PageID.546–47.)

After reviewing the texts, Fox asked Karla whether she had any information about Alison's drug dealers. Karla said that Alison had multiple dealers, but she had seen two of them before. Karla explained that on most Wednesdays after Alison received the $200 from her "ex," she would drive Alison to random restaurants and drop her off. Karla suspected that Alison was buying drugs on these occasions, and she tried to remember details about the individuals Alison was meeting and the cars they drove. When Fox inquired about an individual known as "Buck," Karla said that she had heard that name before and described him as a black male who Alison would normally

---

[2] Thomas admitted during his deposition that the text exchanges were accurately transcribed and that they concerned heroin. (ECF No. 42-7 at PageID.626, 638, 642–44.)

meet at the McDonalds located at 28th St. and Eastern Ave. Karla said that Buck normally arrived in a gold Buick bearing Michigan license plate DYE4467 and would normally park a few spots away. Alison would get into the Buick for a brief period of time and then exit and return to her car, and the Buick would speed away. (ECF No. 42-4 at PageID.335.) Fox told Karla that he suspected Buck had sold Alison the heroin that killed her. Fox then obtained Karla's permission to attempt to set up a transaction with Buck using Alison's phone and Karla's black Infinity Q30. (*Id.*)

Fox, posing as Alison, initiated contact with Thomas by texting BUKfrmGR on Alison's phone that she had been getting her arm checked at the hospital. Fox then wrote, "When can I pu more that was some good shit." Thomas responded, "Whenever just let me know when n how much." (ECF No. 42-4 at PageID.335.) Fox texted that Alison would be "[w]ith mom so itll be a little," and Thomas responded, "OK just hit me up . . ." (*Id.*) Thereafter, Fox arranged for members of the Kent Area Narcotics Enforcement Team (KANET) to take down Thomas if he showed up at the arranged location to sell heroin to Alison. (*Id.* at PageiD.335–36.) Fox recruited Det. Moorhead, who resembled Alison, to stand in for Alison during the deal. Det. Moorhead took Alison's phone and drove Karla's Infinity to the McDonalds at 28th St. and Madison Ave. After parking in the McDonalds lot, Det. Moorhead initiated contact with Thomas. After about 45 minutes, Thomas finally responded and agreed to meet Alison. Thomas initially asked her to meet him at the gas station next door, but changed his mind because the gas station was "hot," meaning that the police regularly monitored that location for drug activity. (*Id.* at PageID.336–37; ECF No. 42-3 at PageID.302; ECF No. 42-7 at PageID.652–53.) Instead, Thomas said that he would walk over to the McDonalds parking lot. The KANET officers observed Thomas walk from the gas station to the McDonalds parking lot and go directly to the black Infinity. When Thomas was up

4

against the passenger side of the vehicle, Sgt. Cammenga, who was wearing a shirt clearly identifying him as a member of the Sheriff's Department, initiated the takedown by announcing himself as the police. In response, Thomas turned and ran through the parking lot but was quickly apprehended by Sgt. Cammenga. (ECF No. 42-4 at PageID.337, 340.) After taking Thomas to the ground, the officers searched him and found a white Apple iPhone. Det. Moorhead sent a text from Alison's phone to the iPhone, and Alison's phone number appeared on the lock screen. (*Id.* at PageID.337.) The officers found no heroin on Thomas, and a K9 unit that searched the area found no heroin. (*Id.* at PageID.338.) Two officers went to the gas station to look for a gold Buick but did not find one. However, they spoke with two occupants of a newer red Chevrolet Malibu, identified as Bethany Guidebeck and Bobby Springer. Subsequent review of the gas station's surveillance video showed Thomas exiting from the red Malibu. (*Id.* at PageID.338, 341.)

On June 21, 2019, Fox checked the Kent County Inmate Lookup and learned that Thomas had been released from the Kent County Jail on June 19, 2019, after being lodged there on a Wyoming, Michigan, warrant for possession of heroin. (*Id.* at PageID.338, 349.) Fox learned that Thomas had been arrested at another McDonalds for heroin possession, where he was found in possession of a used syringe containing heroin. (*Id.* at PageID.350–52.) On April 2, 2019, the assistant prosecutor had authorized a charge of possession of heroin against Thomas. (*Id.* at PageID.352.)

Fox presented the case to Assistant Prosecutor Curtis on June 21, 2019. Curtis authorized a resisting and obstructing charge but denied the possession-with-intent-to-distribute heroin charge pending further investigation. (*Id.* at PageID.341.) Thereafter, Fox obtained and reviewed surveillance video from the Grand Rapids Inn to corroborate Karla's statement that Alison had stayed there the day before she died. He concluded that the video showing Alison's and Thomas's

activity on June 20 matched the text feeds on their phones and corroborated Karla's recollection of events. (ECF No. 42-2 at PageID.235; ECF No. 42-4 at PageID.342–43.) Fox concluded that the drug transaction occurred during the time on the video in which Thomas was seen entering and then exiting a newer red Malibu that had parked in the hotel parking lot and then entering his room with Alison. (ECF No. 42-6 at PageID.535–36.) In August 2019, Dr. Start, the Medical Examiner, determined the cause of Alison's death to be mixed drug toxicity (fentanyl, heroin, and cocaine). (ECF No. 42-2 at PageID.253.)

In December 2019, Fox presented the case to the prosecutor's office for review of a DCSCD charge against Thomas. On December 12, 2019, the assistant prosecutor authorized a delivery of heroin charge against Thomas. Fox then completed the criminal complaint charging delivery of a controlled substance. On January 6, 2020, Fox presented the complaint, warrant, and PC sheet to the 62a District Court and swore to probable cause. Judge Cortez signed all the documents, which Fox left with the court for Thomas's arraignment. (ECF No. 42-2 at PageID.254.) The prosecutor subsequently enhanced the charges to DCSCD. (ECF No. 42-6 at PageID.509, 514–15.)

The district court held a preliminary examination hearing over the course of three days, February 5 and 9 and March 4, 2020, at which the assistant prosecutor presented testimony from Fox, Karla Scott, and Dr. Start, as well as various exhibits. (ECF Nos. 42-3, 42-6, and 43-1.) Thomas was represented by counsel, who thoroughly cross-examined the witnesses. At the conclusion of the hearing, Thomas's counsel challenged probable cause and sought dismissal of the charges. (*Id.* at PageID.711–15.) Although the judge found defense counsel "correct on so many things," he nonetheless noted that the applicable standard, probable cause, is "a very low standard," and that the prosecution's evidence satisfied this standard. (*Id.* at PageID.715–16.)

Thus, the judge observed, "I have no other conclusion but to bind [the case] over to [circuit] court on the enhanced charge by the prosecutors." (*Id.* at PageID.716.)

The DCSCD charge was tried to a jury before Judge Paul J. Denenfeld in the Kent County Circuit Court beginning on July 5, 2022. (ECF No. 43-2.) At the conclusion of the prosecution's case on July 7, 2022, Thomas's counsel moved for a directed verdict on the DCSCD charge. (ECF No. 42-5 at PageID.501–02.) Judge Denenfeld denied the motion, finding that the prosecution had presented sufficient evidence to allow the jury to find beyond a reasonable doubt that Thomas had delivered a controlled substance to Alison that caused her death. (*Id.* at PageID.503–05.) At the conclusion of the trial, the jury returned a verdict of not guilty. (ECF No. 43-4 at PageID.780–81.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the

burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has emphasized that the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III.  Discussion

The Sixth Circuit recognizes claims of malicious prosecution arising under the Fourth Amendment. *See Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (citing *Wallace v. Kato*, 549 U.S. 384, 390 n.2 (2007) (assuming without deciding that such a claim existed)). To establish a malicious prosecution claim premised on the Fourth Amendment, a plaintiff must show that: "(1) the defendant made, influenced, or participated in the decision to [criminally] prosecute; (2) the government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor." *Lester v. Roberts*, 986 F.3d 599, 606 (6th Cir. 2021) (quotation omitted). There is no right to be free from malicious prosecution arising outside of the Fourth Amendment context. *Johnson v. Ward*, 43 F. App'x 779, 782 (6th Cir. 2002) (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1006 n. 19 (6th Cir. 1999)).

A.  **Fox's Motion for Summary Judgment**

1.  **Thomas Is Collaterally Estopped from Relitigating Probable Cause**

As noted above, lack of probable cause is a critical element of a malicious prosecution claim. When a plaintiff has been afforded the opportunity to fully litigate the issue in the

underlying criminal matter, the plaintiff may be precluded from relitigating the issue in his malicious prosecution claim. "Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816-17 (6th Cir. 2010) (quoting *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007)). The Sixth Circuit has held that, "[w]here a party has had a full and fair opportunity to litigate an issue in earlier state proceedings, he is precluded from relitigating the same issue in a later federal case." *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) (internal quotation marks omitted), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001). In *Coogan*, the court held that because the plaintiff had contested the issue of probable cause at his preliminary examination and had the right to call witnesses and cross-examine the state's witnesses, the plaintiff was foreclosed from relitigating probable cause in a subsequent Section 1983 action. *Id.* As the Sixth Circuit has noted:

> The law of our Circuit provides that where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.

*Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) (citing *Coogan*, 820 F.2d at 175).

Under Michigan law, collateral estoppel applies when (1) there is an identity of parties across the proceedings, (2) there was a valid, final judgment in the first proceeding, (3) the same issue was actually litigated and necessarily determined in the first proceeding, and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 434 Mich. 146, 154–57 (1990)). Michigan courts have applied collateral estoppel to bar relitigation of an issue in a civil case that was determined in a prior criminal trial. *See Webb v. City of Taylor*, No. 236153, 2002 WL 31947931, at *4 (Mich. Ct. App. Dec. 3, 2002). Moreover,

9

Michigan courts have held that mutuality is not required when collateral estoppel is used defensively. *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 691–92 (2004).

Here, there is no issue that, as disclosed in the preliminary examination hearing transcripts Fox submitted in support of his motion, the requirements for collateral estoppel on the issue of probable cause are present. Thomas does not dispute Fox's argument on this point. Quoting *Sykes*, however, he asserts that "[p]olice officers cannot in good-faith rely on [a] judicial determination of probable cause to absolve them of liability when that determination was premised on an officers [sic] own material misrepresentations to the court." (ECF No. 46 at PageID.787–88 (quoting *Sykes*, 625 F.3d at 312 (internal quotation marks omitted)).) As set forth in *Sykes* however, a plaintiff making such claim must present evidence showing that the officer "(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [court's] finding of probable cause." 625 F.3d at 312 (internal quotation marks omitted). Thomas makes neither showing. In his deposition, Thomas conceded that, for the most part, he was unable to identify any inaccuracy in Fox's testimony during the preliminary examination hearings. (ECF. No. 42-7 at PageID.614–17.) Thomas did assert, however, that Fox's testimony that Karla told him that she had heard the name "Buck" before or knew Thomas as "Buck" was inaccurate. (*Id.* at PageID.615.) As support, he points to her testimony during the second day of the preliminary examination hearing that she did not know Alison's drug dealers' names, but only "knew their cars." (ECF No. 39 at PageID.39 at PageID.155 (citing ECF No. 39-16 at PageID.189); *see also* ECF No. 42-6 at PageID.570.) Even so, Thomas fails to present evidence showing that Fox's statement that Karla told him during the initial interview—almost seven months before the preliminary examination hearing (ECF No. 42-4 at PageID.335)—that she had heard the name "Buck" was untruthful, or that Karla had ever denied

10

making such statement. Moreover, Thomas fails to demonstrate that the statement was material to the court's finding of probable cause. To that point, the court did not reference Karla's alleged statement in its probable cause finding. (ECFR No. 43-1 at PageiD.715–16.) Rather, it pointed to Thomas's undisputed presence at the hotel and the McDonalds parking lot, as well as his text conversations with Alison as supporting probable cause that he was the individual who supplied Alison the drugs that caused her death. (*Id.* at PageID.716.)

In his response and in his motion for summary judgment, Thomas submits a declaration, trial transcripts containing portions of Fox's and other witnesses' testimonies, and various documents. (ECF Nos. 39-1–39-21.) None of this evidence undermines that state-court's probable cause finding. More importantly, this evidence fails to show that Fox made a materially false statement that formed a basis for the court's probable cause finding. *See Autrey v. Stair*, 512 F. App'x 572, 579 (6th Cir. 2013) ("To the extent that a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action."). For example, Thomas points to Fox's probable cause affidavit in which he stated that Thomas delivered heroin to Alison at the Grand Rapids Inn on June 20, 2019, at around 10:15 a.m. (ECF No. 39-2), and suggests that this statement was false because Fox admitted at trial that he could not be certain from the video what drug was exchanged between Thomas and the individual in the red Malibu at the hotel. (ECF No. 39 at PageID.153–54 (citing ECF No. 39-7).) But this argument misses the mark, because Fox's statements in the probable cause affidavit were based on the entirety of his investigation, not simply the video. Moreover, at the conclusion of the preliminary examination proceeding, Thomas's counsel specifically argued that the video failed to show that

11

an exchange of any kind had occurred. (ECF. No. 43-1 at PageID.712.) Thus, the judge was aware of this fact. Accordingly, because Thomas fails to demonstrate that Fox stated a material falsehood in connection with the preliminary examination, the state-court's probable cause finding is entitled to preclusive effect.

### 2.    Thomas Cannot Show a Deprivation of Liberty

Thomas's claim also fails because he cannot show that the charges Fox investigated and filed resulted in a deprivation of liberty. Thomas admitted that he served no jail time as a result of the delivery charge. When asked about serving time for the charge, he said, "I guess not because I had already been sentenced to a prison on a different case." (ECF No. 42-7 at PageID.609.) In fact, the presentence investigation report Thomas attached to his motion for summary judgment shows that he was arrested for armed robbery on July 9, 2019, pled guilty on December 2, 2019, and was sentenced to a minimum of six years incarceration on January 9, 2020, with 184 days jail credit. (ECF No. 39-13.) Accordingly, Thomas cannot show a deprivation of liberty. *See Passarelli v. Stephenson*, No. 1:23-cv-910, 2023 WL 7144571, at *8 (W.D. Mich. Oct. 31, 2023) (concluding that the plaintiff failed to allege a deprivation of liberty to support his malicious prosecution claim "because, at the time that the destruction of property charge was filed, Plaintiff was already in custody on other charges"); *Leniart v. Bundy*, No. 3:09-cv-9, 2011 WL 4452186, at *7 (D. Conn. Sept. 26, 2011) ("A plaintiff does not have a claim for false arrest or malicious prosecution under section 1983 if, at the time of his arrest and prosecution, he already is in custody on other charges, because there is no deprivation of liberty interests."); *Dillhunt v. Theriault*, No. 9:07-CV-0412, 2009 WL 4985477, at *16 (N.D.N.Y. Dec. 15, 2009) ("Where a prisoner's period of incarceration is not impacted by disciplinary proceedings, however, that inmate has no claim for malicious prosecution under section 1983." (citing *Parker v. City of New York*, No. 05 Civ. 1803, 2008 WL 110904, at *9 (S.D.N.Y. Jan. 7, 2008))).

### B. Thomas's Motion for Summary Judgment

As the foregoing discussion demonstrates, Thomas is not entitled to summary judgment because, as a matter of law, he is unable to establish two critical elements of his claim.

### IV. Conclusion

For the reasons set forth above, I recommend that the Court **deny** Thomas's motion for summary judgment (ECF No. 39), **grant** Defendant Fox's motion for summary judgment (ECF No. 41), and dismiss Plaintiff's complaint with prejudice.

Dated: May 15, 2024                                  /s/ Sally J. Berens
                                                     SALLY J. BERENS
                                                     U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).